[No. 28429. Department Two. August 29, 1941.]

HARRY B. THOMPSON *et al., Respondents,* v. THE DE-
PARTMENT OF LABOR AND INDUSTRIES, *Appellant.*[1]

*The Attorney General* and *Edward S. Franklin, As-
sistant,* for appellant.

*R. E. Young,* for respondents.

JEFFERS, J.—This cause is before us on an appeal
by the department of labor and industries of the state
of Washington from an order, made and entered Janu-
ary 10, 1941, by the superior court for Chelan county,
reversing a decision of the joint board, and ordering
the department to proceed to make an award to
Harry B. Thompson and Lucinda Thompson, his wife,
for the death of their minor son, George Thompson,
who was, by the trial court, found to have been in the
course of his employment, under the workmen's com-

[1]Reported in 116 P. (2d) 372.

pensation act, at the time he received the injuries causing his death.

The case is here on a stipulated statement of facts, under Rem. Rev. Stat., § 392 [P. C. § 7820], since the term of office of the trial judge, Honorable W. O. Parr, expired on January 10, 1941.

On July 22, 1939, Harry B. Thompson and wife filed with the department a claim for compensation, because of the death of their son, in Wenatchee, Washington, on July 15, 1939. August 10, 1939, after investigation of the above claim, the supervisor rejected the same, for the reason "that at the time of alleged injury the claimant was not in the course of his employment." On September 5, 1939, the Thompsons appealed to the joint board for a rehearing, and, on September 12th, a rehearing was ordered. At the rehearing, which was held in Wenatchee, on October 18, 1939, the only witnesses testifying were N. J. Gribnau, the employer, and Harry B. Thompson, father of the deceased minor.

Mr. Gribnau testified that he was in the automobile business in Wenatchee, and owned and operated a motorcycle for hire; that this motorcycle, which had a sidecar attached, was used in carrying parcels and merchandise; that, some few days prior to July 15, 1939, he employed the deceased, George Thompson, who was about sixteen years of age, to operate the motorcycle and make deliveries; that it was agreed that George should receive for his work forty-five per cent of the gross earnings, and that Mr. Gribnau would take care of all expense in connection with the upkeep of the machine, including gas and oil. The witness further testified that orders were phoned into Mr. Gribnau's office from parties who desired to have deliveries made, and that George would then be told where to go to pick up the parcel and make the de-

livery; that George had been making about $1.50 a day; that he was authorized to take orders whether they came through the office or not—in other words, wherever he could find a parcel to deliver, he was expected to deliver it; that he was supposed to report for work at about eight o'clock in the morning; that he would come down after dinner if there were any deliveries to make, or to see if there were any.

It further appears from the testimony of this witness that the boy was authorized to use the motorcycle to go home to his lunch and dinner, and would keep it at his home over night; that, while nothing had ever been said about it, the witness stated that he presumed George could take an order if he could get one on his way to or from his lunch or dinner; that George was supposed to go to lunch at twelve o'clock, but sometimes it was later than that, if he had a package to deliver.

The following questions were then asked, and the following answers made by the witness:

"Q. Was it to your advantage and benefit, Mr. Gribnau, that George use the motorcycle in getting to and from his home for lunch and dinner and also to his own benefit? A. Well, it would not be any more to my advantage, exactly, because they go to dinner and have their own transportation, he could get back as quick as he could with mine. Q. Living where he did, it was more convenient to handle it in that way? A. It was more convenient for himself to have transportation due to the fact that he did not have his own transportation. Q. And he could put in more time on the job? A. I suppose he could. Q. The sooner he could get back the more time he would have to work, is that right? A. Yes."

It further appears from the testimony of this witness that George was killed, July 15th, while on his way home to lunch, when he collided with an automobile; that George usually took about an hour for lunch, and

that it made no difference to the witness where George ate his lunch—"that was up to him where he would eat lunch."

Mr. Gribnau, on recross-examination, further testified:

"Q. It was your understanding, Mr. Gribnau, was it, with George Thompson, that he went home for his lunch and went home for his dinner? A. Yes. Q. And you permitted him to take the motorcycle for that purpose? A. Yes. Q. You did not require him to go home for lunch or dinner? A. No. Q. It wouldn't make any difference to you whether or not he had? A. No, that is a man's own privilege."

Harry B. Thompson testified that his son lived at home, which was about two miles from the business district of Wenatchee; that a bus runs to Ferry street, which is about half way, and there is no other public conveyance which could have been used by George. Mr. Thompson was asked the following questions, and made the following answers:

"Q. Were you present at any time when the matter of this employment was discussed between your son and you and Mr. Gribnau? A. Well, we didn't have very much of a discussion over it. There was a few remarks made at the time. To start with, George came home and told me he had an offer from Nick to go to work there and before he went to work, I saw Nick and just kind of got an outline of what the set-up was and the drift of the conversation was just simply this, I wanted George to do what he was supposed to, and not impose upon Nick in any way, and we live quite a ways out and I asked Nick at the time, 'How do you expect to handle this? How is he going to get back and forth, if the hours are as long as he has to put in you naturally want him on the job as much as possible which is to both of your interest, and when he goes home to eat is he supposed to drive the motorcycle?' And the answer, and as I understood it was, Nick said, 'Well, he has to eat and I suppose that is about the only way he can do it.' Q. Do you know

whether your son was able to afford to eat down town? Was there any reason why he shouldn't eat down town? A. Not very well. He was trying to make what he could on the job and on what little he was making, if he ate down town and chased around much, there wouldn't have been much use of his working on that job the way the thing was."

This witness further testified, on cross-examination, that George was not making much money on the job, and that, for financial reasons, it did not seem advisable for him to eat lunch and dinner downtown, because it would take too much of his earnings; that there were plenty of places where he could have eaten lunch and dinner, as the town was full of eating places.

It further appears from the testimony of Mr. Thompson that he had seen his son just before noon, on the day of the accident, and, as Mr. Thompson had no transportation, it was agreed that, after George had made a delivery at eleven-thirty o'clock, he would pick his father up and take him home; that it was while George was on his way home to lunch, accompanied by his father, who was riding in the sidecar, that the accident happened; that George had no parcels in the sidecar at the time of the accident.

From the foregoing material facts, the joint board concluded:

"After review and consideration of the entire record, the joint board concludes that the claimant at the time of the injury was not in the course of his employment but was using the motorcycle with the permission of his employer for the claimant's own convenience and benefit and not in furtherance of the interests of his employer; that the claimant was injured on the public highways while in the act of going home for lunch for his own personal advantage. That there is no testimony in the record establishing that the furnishing of a motorcycle by the employer formed a part of the contract of employment and a consideration for the claimant's hire, but on the con-

trary discloses that the use of the motorcycle was not to the employer's advantage but solely to the claimant's. That the supervisor's action was correct and should be sustained. (Don MacRae v. Department, 185 W. 343.)"

On October 30, 1939, the joint board entered an order sustaining the decision of the supervisor. Claimants appealed from the order of the joint board to the superior court for Chelan county, which, after considering the record, made and entered an order reversing the decision of the joint board, and from this order the department has appealed. Error is assigned upon the entry of the order of January 10, 1941, reversing the order of the joint board and awarding compensation to claimants.

The sole question in this case is whether the deceased, at the time of the accident which caused his death, was "in the course of his employment." The trial court, in holding that deceased was in the course of his employment at the time of the accident, relied upon the case of *Venho v. Ostrander R. & T. Co.*, 185 Wash. 138, 52 P. (2d) 1267. The department relies very largely upon the rule announced in the case of *Hama Hama Logging Co. v. Department of Labor & Industries*, 157 Wash. 96, 288 Pac. 655.

In the *Venho* case, the plaintiff had been employed in the woods by defendant company as a faller, but had ceased work the evening before the accident happened, and, at the time of the accident, was on his way out from the camp to the town of Ostrander. The accident occurred when two logging trains, operated by defendant, collided, and at the time of the collision the plaintiff was riding on one of the trains. It was alleged in the complaint, and admitted by the company, that it was the custom of the company to transport employees on their logging trains to and from their camps. In the course of the opinion, we stated:

"It is the general rule (to which this court adheres) that a workman injured going to or from the place of work is not 'in the course of his employment.' There is an exception, however, as well established as the rule itself. The exception, which is supported by overwhelming authority, is this: When a workman is so injured while being transported in a vehicle furnished by his employer as an incident of the employment, he is within 'the course of his employment,' as contemplated by the act. In other words, when the vehicle is supplied by the employer for the mutual benefit of himself and the workman to facilitate the progress of the work, the employment begins when the workman enters the vehicle and ends when he leaves it on the termination of his labor.

"This exception to the rule may arise either as the result of custom or contract, express or implied. It may be implied from the nature and circumstances of the employment and the custom of the employer to furnish transportation."

Respondents contend that the facts in the instant case bring it within the exception to the general rule, which was the basis for the decision in the *Venho* case.

The *Venho* case cites and relies upon the case of *Wabnec v. Clemons Logging Co.*, 146 Wash. 469, 263 Pac. 592. In that case, Wabnec presented himself at the office of the logging company, at Melbourne, Washington, having in his possession a ticket which he had obtained at a Seattle employment office, and which he surrendered to the company after signing a written contract of employment. After signing the contract, Wabnec boarded one of the company's trains, which was on the way to the camp where work was in progress. During the trip a collision occurred, and Wabnec was injured. The trial court granted a motion for nonsuit at the close of the plaintiff's case, on the theory that the plaintiff, at the time he was injured, was an employee of the company; that the injury occurred

on the premises of the company; that the workmen's compensation act applied; and that an action for personal injuries would therefore not lie. In the course of the opinion in the cited case, we stated:

"The claim that the appellant was not yet an employee because he had not yet performed any service for the respondent must be answered by the fact that under the workmen's compensation act (Rem. Comp. Stat., § 7675) [P. C. § 3470], it is provided that an employee is one who has contracted to engage in extrahazardous work. The contract therefore establishes the relationship between the parties, and not the fact whether work has actually been commenced and the employee's name placed on the payroll and he has already become entitled to wages. The appellant in this case was injured while in the course of his employment and incidental thereto, *for it was necessary for him to be riding on the respondent's train on his way to work,* and it is often held under similar circumstances, where the employer has furnished the means of transportation to the place of work and either before or after the work has actually commenced the employee is injured, that that injury arises out of and in the course of his employment." (Italics ours.)

The *Venho* case, *supra,* in referring to and distinguishing the *Hama Hama* case, states:

"The *Hama Hama* case simply holds that a workman who is using, for his own ends, a vehicle supplied by the employer is not in the course of his employment. It in no wise trenches on the principle of the cases we have cited, holding that a workman is in the course of his employment when riding in a vehicle furnished by the employer *pursuant to, and as a necessary incident of, the contract of employment.*" (Italics ours.)

The opinion in the *Venho* case concludes with these words:

"Since it appears from the evidence that transportation on its logging trains was furnished by Ostrander Railway & Timber Company to appellant *as a neces-*

*sary incident* to the contract of employment, the judgment will be affirmed." (Italics ours.)

In the *Hama Hama* case, *supra,* the workman was injured while riding on a speeder, operated by the company for the benefit of its employees. At the time of the accident, which was on a Sunday morning, Spears, the workman, was going from the camp to Eldon, from choice and for recreation. It does not appear that, at the time of Spears' departure from camp, his employment was ended. In view of the fact that the rule announced in the *Hama Hama* case is still the general rule in this state, and in view of the further fact that the cited case holds and announces that under certain conditions an employee "is not in the course of his employment," even when he is injured while using or riding in a conveyance furnished by his employer, we quote from the cited case:

"If, at the time of the injury, Spears was engaged in or was furthering his employer's business, he was injured 'in the course of his employment.' If Spears was injured at a time when he was doing something solely for his own benefit or accommodation, he was not injured 'in the course of his employment.'

" 'The words, "in the course of the employment" relate to the time, place and circumstances under which the accident takes place. An accident arises in the course of the employment when it occurs within the period of the employment at a place where the employee reasonably may be in the performance of his duties and while he is fulfilling those duties or engaged in doing something incidental thereto.' *Case of Fournier,* 120 Me. 236, 113 Atl. 270.

" 'The controlling factor in determining whether the employee is in the course of his employment is whether at the time of the accident he was within the orbit, area, scope, or sphere of the employment.' *Danville, U. & C. R. Co. v. Industrial Commission,* 307 Ill. 142, 138 N. E. 476.

"Within the meaning of the workmen's compensa-

tion act, an injury arises in the course of the employment,

" ' . . . when it occurs within the period of the employment at a place where the employee may reasonably be, and while he is reasonably fulfilling the duties of his employment or is engaged in doing something incidental to it.' 2 Words & Phrases (3d Series), 594.

"Spears was not engaged in furthering the interests of his employer at the time he received his injuries. Those injuries were sustained on an occasion when time was his own. He was making the trip from the camp on his own time and for his own personal business or pleasure. He was not working. No one had any supervision over him."

The following statement, found in the cited case, we think particularly applicable to the instant case:

"The logging company merely permitted or authorized its employees to ride on the speeder free of charge, as a convenience to the employees, and not in the furtherance of its business."

Other cases are cited by both appellant and respondents, but we think no good would result from a discussion of them, as the *Hama Hama* case announces the general rule in this state, and the *Venho* case announces the exception to the general rule.

We appreciate, of course, that the facts in no two cases are exactly alike, and that the difficulty in these cases arises in deciding whether the general rule or the exception is applicable in a given case.

We are convinced, after a consideration of this record, that the general rule, as announced in the *Hama Hama* case, is applicable herein, and that the deceased minor was not in the course of his employment at the time he received the injuries causing his death. See *Wood v. Chambers Packing Co.*, 190 Wash. 411, 68 P. (2d) 221. We are in accord with the conclusion of the joint board, hereinbefore set out, and

with the decision made in accordance with such conclusion.

We believe there is a clear distinction between cases such as the *Venho* case, where the employee is injured while using or riding in a conveyance furnished or made available by the employer, and such use is necessary for, or an incident to, the furtherance of the employer's business, and the instant case, where the employee is permitted, for his own convenience alone, to use a vehicle furnished by the employer.

We are satisfied that the evidence does not overcome the *prima facie* correctness of the decision of the joint board.

The order of the trial court must be and is hereby reversed, with directions to enter a judgment affirming the order of the joint board.

ROBINSON, C. J., BEALS, and SIMPSON, JJ., concur.

MILLARD, J. (dissenting)—I dissent. The workman was injured while on his way home to lunch in a vehicle supplied by his employer as a part of the contract of employment, hence the workman was injured while in the course of his employment.