# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| CYRIL J. WORM,<br><br>                 Appellant,<br><br>   v.<br><br>NORTHWEST TRUSTEE SERVICES OF WASHINGTON, a Washington corporation; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., a Delaware corporation; BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK AS TRUSTEE FOR THE HOLDERS OF CWALT, INC., ALTERNATIVE LOAN TRUST 2004-J12; MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2004-J12; RESIDENTIAL CREDIT SOLUTIONS, INC.,<br><br>                 Respondents. | No. 47779-3-II<br><br><br>UNPUBLISHED OPINION |

LEE, J. — Cyril Worm appeals from the superior court's CR 12(b)(6) dismissal of his complaint alleging violations of the Consumer Protection Act (CPA)[1] relating to nonjudicial foreclosure proceedings on his property. We hold that (1) the entity that initiated the nonjudicial foreclosure proceedings was entitled to foreclose because it held the promissory note; (2) the assignments of the deed of trust complied with Washington law and the mortgage documents; (3) a new notice of default was not required even though the sale date noted in the second notice of trustee's sale was more than 120 days after the sale date noted in the first notice of trustee's sale;

---

[1] Ch. 19.86 RCW.

and (4) we decline to address Worm's claim that the superior court erred in awarding attorney fees to respondents. Therefore, we affirm.

FACTS

A. PROVISIONS OF THE LOAN INSTRUMENTS

In late October 2004, Worm took out a mortgage loan on property in Belfair, Washington (Property). Pursuant to the mortgage, Worm executed a promissory note (Note) in favor of RBC Mortgage Company (RBC) and secured the Note with a deed of trust (Deed of Trust). Worm acknowledged that the lender could transfer the Note, and that the lender, or whoever the lender transferred the Note to, would be considered the "Note Holder" and would be entitled to receive the payments under the Note. Clerk's Papers (CP) at 36. In the Note, Worm also acknowledged that failure to pay the full amount due each month would result in default, at which point "the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount." CP at 37.

The Deed of Trust identified Worm as the Borrower, RBC as the Lender, Evergreen Title Company, Inc. as the Trustee, and Mortgage Electronic Registration Systems, Inc. (MERS) as "a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns." CP at 42. In bold typeface, the Deed of Trust stated that "MERS is the beneficiary under this Security Instrument." CP at 42 (boldface omitted). The fact that MERS, including its successors and assigns, was the beneficiary of the Deed of Trust was repeated several other times throughout the Deed of Trust. *See e.g.* CP at 43 ("The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS").

The Deed of Trust also stated, "The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. . . . There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note." CP at 51. In addition, the Deed of Trust stated that "Lender may from time to time appoint a successor trustee" without conveying the Property, and the successor trustee will "succeed to all the title, power and duties conferred" to the Trustee. CP at 53. Should Worm default and the Lender decide to accelerate the loan, the Deed of Trust required the lender to provide notice to Worm that included, among other things

> (c) a date, not less than 30 days from the date the notice is given to [Worm], by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction at a date not less than 120 days in the future.

CP at 52 (boldface omitted). Finally, the Deed of Trust provided for attorney fees "in any action or proceeding to construe or enforce any term of this Security Instrument." CP at 53.

B.     TIMELINE OF THE LOAN INSTRUMENTS

1.     First Assignment of the Deed of Trust

On June 9, 2010, MERS assigned the Deed of Trust to "The Bank of New York Mellon FKA The Bank of New York as Trustee for the Certificateholders CWALT, Inc. Alternative Loan Trust 2004-J12 Mortgage Pass-Through Certificates, Series 2004-J12" (Trust 1). CP at 59 (some capitalization omitted). This assignment of deed of trust (Assignment of Deed of Trust) was recorded with Mason County on June 11, 2010.

2.    Loan Modification Agreement

On March 7, 2011, Worm entered into a Loan Modification Agreement (LMA) with BAC Home Loans Servicing, LP (BAC), which was recorded with Mason County on November 16, 2011.[2]  The LMA stated that BAC "is a subsidiary of Bank of America, N.A."  CP at 66.  In the LMA, Worm was designated as the grantor and borrower, BAC was designated as the lender, and MERS was designated as the grantee.  The LMA stated that the Note and Deed of Trust would remain otherwise unchanged, and that the borrower and lender under the LMA would remain otherwise bound by the terms set forth in the Note and Deed of Trust.  The signatures on the LMA of both Worm and a vice president of MERS, as "[n]ominee for Bank of America N.A. as successor by [m]erger to BAC" were notarized.  CP at 68.

3.    Second Assignment of the Deed of Trust

On October 1, 2012, a second Assignment of Deed of Trust was recorded in Mason County. In it, MERS assigned the Deed of Trust to "The Bank of New York Mellon FKA The Bank of New York as Trustee for the Holders of CWALT, Inc., Alternative Loan Trust 2004-J12, Mortgage Pass-Through Certificates, Series 2004-J12" (Trust 2).[3]  CP at 60 (some capitalization omitted).

---

[2] The cover page of Worm's opening and reply briefs on appeal identify BAC as a Respondent. However, BAC was not listed as a defendant in the caption of Worm's complaint.  The issue of whether BAC is a defendant is not before us.

[3] Despite the very similar names, this assignee, Trust 2, is slightly different than Trust 1, the June 9, 2010 assignee. *Cf.* CP at 60 (having the term "Holders" in Trust 2's name) *with* CP at 59 (having the term "Certificateholders" in Trust 1's name).  Further proof that Trust 1 and Trust 2 are different entities is found at CP 62, where Trust 1 assigns the Deed of Trust to Trust 2.  Trust 2 appears to be the defendant named in Worm's complaint, except Worm's complaint recited part of Trust 2's name ". . . Trust 2004-J2 . . ." rather than, ". . . Trust 2004-J12 . . . ." *Cf.* CP 60 (reciting Trust 2's name) *with* CP 133 (complaint) (some capitalization omitted).

4

4.      Beneficiary Declaration

On January 13, 2014, a vice president and assistant secretary for Residential Credit Solutions, Inc., as attorney-in-fact for Trust 2, signed a beneficiary declaration stating that Trust 2 was "the actual holder of the promissory note or other obligation evidencing the above-referenced loan." CP at 72.

5.      Third Assignment of the Deed of Trust and Appointment of Successor Trustee

On February 4, 2014, a third Assignment of Deed of Trust was recorded with Mason County. In this Assignment of Deed of Trust, Trust 1 assigned the Deed of Trust to Trust 2. On the same day, also recorded with Mason County was an Appointment of Successor Trustee. The Appointment of Successor Trustee noted that the current trustee was Evergreen Title Company, Inc., and that Trust 2, as the "present beneficiary under [the Deed of Trust]" appointed Northwest Trustee Services, Inc. (NWTS), as the successor trustee. CP at 74.

6.      First Notice of Default and First Notice of Trustee's Sale

On February 14, 2014, NWTS, on behalf of Trust 2, issued a Notice of Default (NOD) to Worm. The NOD identified Trust 2 as the "owner" of the note, Residential Credit Solutions, Inc. as the loan servicer, and NWTS as the trustee. In bold typeface, the NOD stated, "If you do nothing, a notice of sale may be issued as soon as 30 days from the date of this notice of default. The notice of sale will provide a minimum of 120 days' notice of the date of the actual foreclosure sale." CP at 76 (boldface omitted).

On March 25, 2014, a Notice of Trustee's Sale (first NOTS) was recorded with Mason County. NWTS and Trust 2 were listed as the grantors, and Worm was listed as the grantee. The first NOTS set the sale date for August 1, 2014.

7.      Second Notice of Trustee's Sale

On September 24, 2014, a notice of discontinuance of trustee's sale was recorded with Mason County. It stated that NWTS, as trustee, was discontinuing the sale that was set in the first NOTS but was not "waiving any breach or default" under the Deed of Trust or "impairing any right or remedy thereunder." CP at 87. It was signed by a representative of NWTS.

The same day, September 24, a second Notice of Trustee's Sale (second NOTS) was recorded with Mason County. Again, this second NOTS listed NWTS and Trust 2 as the grantors and Worm as the grantee. The second NOTS set the sale date for January 23, 2015.

8.      Present Action is Initiated

On January 12, 2015, Worm filed suit against NWTS, MERS, Trust 2, Residential Credit Solutions, Inc., and John Does 1-20 in Mason County. CP at 133. In his complaint, Worm alleged violations of the CPA. Specifically, Worm argued that: (1) MERS improperly assigned "interests in the Note and DOT [Deed of Trust] on two separate occasions," CP at 140; (2) the Note and Deed of Trust were not placed in Trust 2 within a time period required by federal law; (3) Trust 2 did not have an ownership interest in the Note or Deed of Trust but pursued nonjudicial foreclosure anyway; (4) Trust 2 assigned the Note and Deed of Trust to itself; (5) NWTS was not the successor trustee; (6) NWTS could not rely on the NOD to issue the second NOTS; and (7) the sale date in the second NOTS violated RCW 61.24.040(6) because it was 175 days after the sale date set in the first NOTS.

Respondents moved to dismiss under CR 12(b)(6), arguing Worm had failed to state a claim under which relief could be granted. The superior court agreed and dismissed the case.

Worm appeals.

6

No. 47779-3-II

ANALYSIS

A. STANDARD OF REVIEW

We review CR 12(b)(6) dismissals for failure to state a claim under which relief can be granted de novo. *Trujillo v. Nw. Tr. Servs., Inc.*, 183 Wn.2d 820, 830, 355 P.3d 1100 (2015). Generally, when considering a motion to dismiss under CR 12(b)(6), the superior court may only consider the allegations contained within the pleadings. *Rodriguez v. Loudeye Corp.*, 144 Wn. App. 709, 725, 189 P.3d 168 (2008). Dismissal is proper if the plaintiff is unable to prove a set of facts sufficient to justify the relief sought. *Trujillo*, 183 Wn.2d at 830.

B. *BAIN* CONTROLS: A NOTE HOLDER IS ENTITLED TO ENFORCE

Worm argues that Trust 2 was not a beneficiary, so it was not entitled to foreclose because it did not own the Note. Worm asserts that RCW 61.24.030(7)(a), RCW 62A.9A.203(a), (b), and (g),[4] and RCW 62A.3-310(b)[5] limit enforcement of the obligations under a promissory note to the

---

[4] This is a case involving negotiable instruments. Therefore, article 9 of the Uniform Commercial Code, codified at chapter 62A.9A RCW, does not apply because that chapter governs secured transactions.

[5] RCW 62A.3-310(b) provides:

> Unless otherwise agreed and except as provided in subsection (a), if a note or an uncertified check is taken for an obligation, the obligation is suspended to the same extent the obligation would be discharged if an amount of money equal to the amount of the instrument were taken, and the following rules apply:
> (1) In the case of an uncertified check, suspension of the obligation continues until dishonor of the check or until it is paid or certified. Payment or certification of the check results in discharge of the obligation to the extent of the amount of the check.
> (2) In the case of a note, suspension of the obligation continues until dishonor of the note or until it is paid. Payment of the note results in discharge of the obligation to the extent of the payment.

person or entity *owning* the promissory note.[6]  We follow our Supreme Court's decision in *Bain v. Metropolitan Mortgage Group, Inc.*, 175 Wn.2d 83, 88, 285 P.3d 34 (2012) (quoting RCW 61.24.005(2)), and hold that only "'the holder of the instrument or document evidencing the obligations secured by the deed of trust'" can be the beneficiary.

Our Supreme Court in *Bain* held "only the actual holder of the promissory note or other instrument evidencing the obligation may be a beneficiary with the power to appoint a trustee to proceed with a nonjudicial foreclosure on real property." *Id*. at 89.  The Supreme Court recently upheld the *Bain* opinion in *Brown v. Department of Commerce*, 184 Wn.2d 509, 540, 359 P.3d 771 (2015).  There, the court held that it would

> follow *Bain*'s affirmation of the plain language of the definition of beneficiary in RCW 61.24.005(2).  That statute defines a beneficiary as "the holder of the instrument" and makes no mention of ownership.  RCW 61.24.005(2).  Consistent with article 3's recognition that a holder of a note is entitled to enforce the note, we adhere to *Bain*'s holding that RCW 61.24.005(2) requires the beneficiary be the holder of the note.  *See Bain*, 175 Wn.2d at 91, 120.  To conclude otherwise—i.e.,

---

(3) Except as provided in subsection (b)(4), if the check or note is dishonored and the obligee of the obligation for which the instrument was taken is the person entitled to enforce the instrument, the obligee may enforce either the instrument or the obligation.  In the case of an instrument of a third person which is negotiated to the obligee by the obligor, discharge of the obligor on the instrument also discharges the obligation.

(4) If the person entitled to enforce the instrument taken for an obligation is a person other than the obligee, the obligee may not enforce the obligation to the extent the obligation is suspended.  If the obligee is the person entitled to enforce the instrument but no longer has possession of it because it was lost, stolen, or destroyed, the obligation may not be enforced to the extent of the amount payable on the instrument, and to that extent the obligee's rights against the obligor are limited to enforcement of the instrument.

[6] To the extent Worm argues that BAC owns the Note because of the pooling and services agreement, that argument is immaterial.  "[A] person need not own a note to be entitled to enforce the note." *Brown v. Dep't of Commerce*, 184 Wn.2d 509, 525, 359 P.3d 771 (2015) (emphasis omitted).

to hold that the "beneficiary" for purposes of the mediation exemption statute, RCW 61.24.166, is the owner and *not* the note holder—would undermine *Bain*'s core rationale that rested on the definition of a beneficiary in RCW 61.24.005(2) as the note holder.

*Brown*, 184 Wn.2d at 540. The *Brown* court reasoned that RCW 62A.3-301 "provides that a person *need not* own a note to be entitled to enforce the note." *Id*. at 525.

The *Brown* court also noted that its decision in *Cashmere Valley Bank v. Department of Revenue*, 181 Wn.2d 622, 334 P.3d 1100 (2014),

reinforces what we have said about the distinction between an owner of a note and a holder of a note. [In *Cashmere Valley Bank*, w]e held there that merely because an institution has a right to the economic benefits of mortgage-backed securities (i.e., is the owner of the mortgage notes or is a trust beneficiary where the settlor of the trust owns the notes) does not necessarily mean the institution has "any legal recourse to the underlying trust assets in the event of default." [181 Wn.2d at 625]. We further recognized an institution could be the person entitled to enforce the mortgage note, the [person entitled to enforce], even though it was not the owner. *Id*. at 626 n.4 (noting that when a lender sells a mortgage note on the secondary market, the "lender may continue servicing the mortgage for a fee" and "in the event of the borrower's default, the lender may foreclose on the property and pass along proceeds from the sale, less the lender's fee or share, to the buyer"), 636 (recognizing that when the trustee of a pool mortgage-backed securities *holds* the mortgage notes on behalf of the owner of the mortgage notes, the trustee can foreclose), 641 (similar).

*Id.* at 540 n.16.

Thus, the law in Washington is well settled that "only the actual holder of the promissory note or other instrument evidencing the obligation may be a beneficiary with the power to appoint a trustee to proceed with a nonjudicial foreclosure on real property." *Bain*, 175 Wn.2d at 89. Accordingly, we hold that Worm fails to state a claim upon which relief can be granted because his argument that Trust 2 could not enforce the obligations under the Note because Trust 2 did not own the Note fails.

C.     ASSIGNMENTS OF THE DEED OF TRUST

Worm next argues that the superior court erred in dismissing his suit because MERS's assignments of the Deed of Trust were invalid.[7]  Specifically, Worm argues that MERS's assignments were "legally ineffective because MERS *never* possessed the lien interest it purported to transfer" and "MERS never 'held' or 'owned' the Note."  Br. of Appellant at 19.  We hold that MERS assignment of the Deed of Trust was valid because it complied with Washington agency law as well as the terms of the Note, the Deed of Trust, and the LMA.[8]

Our Supreme Court has recognized that the use of agents to make assignments of security instruments is valid under Washington law, so long as the agent's principal is identified.  *Bain*, 175 Wn.2d at 106-07.  However, in *Bain*, our Supreme Court held that "the language in the deeds of trust that describe MERS as 'acting solely as a nominee for Lender and Lender's successors and assigns'" was insufficient to create an agency relationship between MERS and successive noteholders.  *Id*. at 107 (quoting the record).

---

[7] In his Assignments of Error, Worm contends that the superior court "erred by failing to rule each of the assignments of deeds of trust invalid."  Br. of Appellant at 1 (assignment of error 3). However, Worm only presents argument relating to the first and second assignments of the Deed of Trust that were effected by MERS in 2010 and in 2012.  And in his complaint, Worm only argues violations of the CPA for MERS assigning interests in the Note and Deed of Trust "on two separate occasions."  CP at 140.  The third assignment of the Deed of Trust was effected by Trust 1 in favor of Trust 2 on February 4, 2014.  The record does not explain the authority by which Trust 1 could assign the Deed of Trust to Trust 2, as Trust 2 had been assigned the Deed of Trust in 2012 by MERS and held the Note at the time, per a declaration by its attorney-in-fact on January 13, 2014.  But without argument on the potential error or its effect, we do not consider it.

[8] Worm also argues that he has standing to challenge the legality of all of the assignments.  We do not address the standing and statute of limitations challenges because we hold that MERS had authority to assign the Deed of Trust.

Here, the LMA designated MERS as the grantee and the nominee for the lender, BAC.[9] CP at 64-68. MERS signed the LMA on behalf of BAC. The LMA stated that "[e]xcept as otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and the Borrower and Lender will be bound by, and comply with, all terms and provisions thereof, as amended by this Agreement." CP at 66. Under the Deed of Trust, "[t]he Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower." CP at 51. Nothing in the LMA changed this provision in the Deed of Trust.

When MERS assigned the Deed of Trust on October 1, 2012, MERS had been identified as the agent for BAC, who was the beneficiary under the Note. Therefore, MERS's assignment of the Deed of Trust was valid because the assignment complied with Washington agency law and complied with the provisions of the Note, Deed of Trust, and LMA. Thus, Worm fails to state a claim upon which relief can be granted because MERS's assignments of the Deeds of Trust were valid.

---

[9] In *Bain*, 175 Wn.2d at 107, our Supreme Court seemed to concede that a lender's nomination of MERS as a nominee could create an agency relationship between MERS and that particular lender, so long as that lender is clearly identified as the principal accountable for MERS actions.

D.     REQUIREMENT OF A NEW NOTICE OF DEFAULT

Worm argues that NWTS was required to have issued a new NOD after the first NOTS was discontinued and before the second NOTS was issued because the sale date set in the second NOTS was more than 120 days beyond the sale date noted in the first NOTS.  We disagree.

Worm cites RCW 61.24.030(8) and .040(6) and relies on the following passage from *Albice v. Premier Mortgage Services of Washington, Inc.*, 174 Wn.2d 560, 568, 276 P.3d 1277 (2012): "[U]nder RCW 61.24.040(6), a trustee is not authorized, at least not without reissuing the statutory notices, to conduct a sale after 120 days from the original sale date, and such a sale is invalid." Worm contends that, in this passage, our Supreme Court has held that a trustee's sale must be held within 120 days of the sale date set forth in the first notice of trustee's sale, or a new notice of default must be issued.  We follow the reasoning explained by Division One of this court in *Leahy v. Quality Loan Service Corp. of Washington*, 190 Wn. App. 1, 359 P.3d 805 (2015), *review denied*, 185 Wn.3d 1011 (2016), and reject Worm's contention that a new NOD needed to be issued after the first trustee's sale was discontinued and a new NOTS was issued.

The timeline in *Leahy* was as follows: April 2010 – notice of default was issued; July 2010—notice of trustee's sale was issued and set for October 2010; July 2012—second notice of trustee's sale was issued; September 18, 2012—third notice of trustee's sale was issued; September 26, 2012—discontinuance of the trustee's sale was noted in the second notice of trustee's sale; January 2013—the trustee's sale was held as noted in the third notice of trustee's sale. *Leahy*, 190 Wn. App. at 4.  The plaintiffs argued that under RCW 61.24.030 and .040, the deed of trust act required a new notice of default, and that, under *Albice*, "when a trustee's sale does not occur

12

within 120 days of the originally scheduled date for the sale, a new sale cannot be scheduled unless the trustee sends out a new notice of default." *Id*. at 5-6.

In response to the plaintiffs' statutory argument in *Leahy*, Division One explained that RCW 61.24.030(8) requires the written notice of default to contain certain information that must be transmitted to the borrower at least 30 days before a notice of sale is recorded, and that RCW 61.24.040(1) and (6) require certain information in the notice of sale and allow the trustee to "postpone the sale for up to 120 days from the date provided in the notice of sale without issuing a new notice. If the sale is not held within 120 days from the date provided in the notice of sale, a new notice of sale is required." *Id*. at 5-6 (internal citations omitted). With respect to the plaintiffs' argument, Division One held that based on the statutory language, "[n]o such requirement exists in the act." *Id*. at 5.

After quoting the same portion of *Albice* that Worm now relies on, Division One explained:

> The Leahys rely on the court's use of the plural "notices" in the sentence emphasized above. They assume that the statutory notices that must be reissued include not only the notice of trustee's sale, but also the notice of default. There is no basis for this assumption in either the plain language of the statute or in *Albice*. There are other statutory notices that the court may have been referring to, such as the notice of foreclosure that must accompany the notice of trustee's sale. RCW 61.24.040(2). And the holding in *Albice* pertained to the specific statutory limit that requires a scheduled sale to occur within 120 days of the recording of the notice of sale. The court did not announce a new, nonstatutory requirement for reissuing a notice of default.

> In light of the function served by the notice of default as compared to the notice of trustee's sale, it would not make sense to interpret the act as requiring reissuance of the notice of default. "The purpose of the notice of default is to notify the debtor of the amount he owes and that he is in default." *Koegel v. Prudential Mut. Sav. Bank*, 51 Wn. App. 108, 112, 752 P.2d 385, *review denied*, 111 Wn.2d 1004 (1988). The original notice serves that purpose. The notice of trustee's sale, by contrast, must be recorded to give notice to the world that a foreclosure sale is scheduled for a specific date. The sale can be continued, but not beyond the 120–

> day period. Once the 120–day period expires, a new trustee's sale must be scheduled and a new notice of sale must be issued and recorded to ensure that potential buyers are informed of the new sale date.

*Id*. at 6-7.

Here, NWTS filed a notice of discontinuance of the trustee's sale on September 24, 2014. That notice discontinued the sale that was set in the first NOTS for August 1, 2014. The same day that NWTS discontinued the sale noted in the first NOTS, it filed a second NOTS, setting the sale date for January 23, 2015. Worm argues that setting the sale date for January 23, 2015 was invalid without a new NOD being issued because January 23 is more than 120 days beyond the August 1, 2014 sale date that was set in the first NOTS. As explained above, this is the same argument rejected by Division One in *Leahy*. We follow Division One's holding in *Leahy* and reject Worm's argument that a new NOD needed to be issued after the first NOTS was discontinued and the second NOTS set the sale date more than 120 days from the sale date noted in the first NOTS. Because we hold that a new NOD was not required, Worm fails to state a claim upon which relief can be granted.

E.      ATTORNEY FEES

1.      Superior Court Attorney Fees

Worm assigns error to the superior court's award of attorney fees pursuant to the Deed of Trust and in favor of respondents. However, Worm does not dedicate any portion of his argument to this assignment of error. Where "a party fails to support assignments of error with legal arguments, they will not be considered on appeal." *Howell v. Spokane & Inland Empire Blood Bank*, 117 Wn.2d 619, 624, 818 P.2d 1056 (1991).

14

2.        Attorney Fees on Appeal

Trust 2 requests reasonable attorney fees and costs on appeal under RAP 18.1, RAP 14.2, and RAP 14.3.  Trust 2 argues that it is the prevailing party on appeal and so is entitled to an award of attorney fees pursuant to the terms in the Deed of Trust.  We deny Trust 2's request for attorney fees.

The Deed of Trust provides that:

> Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument. The term "attorneys' fees," whenever used in this Security Instrument, shall include without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

CP at 53.  The Deed of Trust named RBC the "Lender."  CP at 41.  The LMA amended the Deed of Trust and BAC became the "Lender."  CP at 66.  Trust 2 was assigned the Deed of Trust in 2012 and held the Note by mid-January 2014.

But assignment of the Deed of Trust does not necessarily change the identity of the Lender. *See Cashmere Valley Bank*, 181 Wn.2d. at 626 n.4 (explaining that a lender may sell the mortgage and deed of trust to a buyer, but the "lender may foreclose on the property [in default] and pass along proceeds from the sale, less the lender's fee or share, to the buyer.").  Here, the last identified Lender was BAC, per the LMA.  The record does not show that Trust 2 is the Lender, and Trust 2 does not argue that it is the Lender.  Rather, Trust 2 argues only that it is entitled to attorney fees and costs because it unequivocally held the secured Note during the time relevant to Mr. Worm's allegations.  Therefore, we deny Trust 2 request for reasonable attorney fees and costs because it has not demonstrated it is entitled to attorney fees and costs under the Deed of Trust.

No. 47779-3-II

CONCLUSION

Worm's allegations supporting his CPA fail because Trust 2, as holder of the Note, could proceed with a nonjudicial foreclosure on the property; MERS's assignments of the Deed of Trust were valid; and a new notice of default was not required. Thus, Worm fails to state a claim upon which relief could be granted. Therefore, we affirm the superior court's CR 12(b)(6) dismissal of this case and its award of attorney fees to respondents.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Lee, J.

We concur:

_____
Johanson, J.

_____
Maxa, A.C.J.

16